## THOMPSON et ux. v. JONES et al.
### No. 5169.

Court of Civil Appeals of Texas. Texarkana.

March 2, 1938.

Rehearing Denied March 10, 1938.

A. V. Grant, of Longview, for appellants.

Tom L. Beauchamp, of Tyler, I. C. Underwood, of Marshall, and Harrington & Harrington, of Longview, for appellees.

JOHNSON, Chief Justice.

This is an action of trespass to try title to the north one-half of block 13 in the town of Gladewater, Gregg county, Tex., filed December 29, 1931, by appellants, Pat Thompson and wife, plaintiffs in the trial court, against a number of defendants, among whom were Minnie Thompson Jones and Leroy Thompson. Judgment was entered March 24, 1932, in favor of plaintiffs against all defendants, upon service of process by publication. A bill of review was filed January 3, 1933, within the time prescribed by law, R.S. art. 2236, and a new trial was granted. Leroy Thompson died during pendency of the suit. His heirs intervened, and by pleadings in the nature of a cross action asserted title to an interest in the land. Like pleadings were filed by Minnie T. Jones, joined by her husband, O. J. Jones. The heirs of Betty Wilburt, deceased, also intervened and claimed an interest in the property. Plaintiffs, Pat Thompson and wife, by their first amended original petition specially pleaded the statute of ten years' limitation. Vernon's Ann. Civ.St. art. 5510.

Title to the land in controversy was acquired by Robert Thompson and wife, Harriett, in 1890. Robert Thompson died about 1903. His wife, Harriett, died prior to that date. Pat Thompson, Minnie Thompson Jones, and Leroy Thompson were children of and the sole surviving heirs of Robert and Harriett Thompson, and as such heirs they inherited title to the land now in controversy.

On October 5, 1917, D. S. Meredith, as sheriff of Gregg county, executed and delivered to A. F. Sheppard a deed purporting to have been made under authority of an order of sale issued out of the district court of Gregg county in a judgment foreclosing a lien in favor of the state of Texas for delinquent taxes against the property. The deed purports to convey "all of the estate, right, title and interest which the said Pat Thompson had on the 22nd day of May, A. D. 1917, or at any time afterwards," in and to the north one-half of block 13 of the town of Gladewater.

By general warranty deed dated February 21, 1921, A. F. Sheppard and wife, Bertha, conveyed to Pat Thompson:

"All that certain tract, lot or parcel of land, situated in the town of Gladewater, Gregg County, Texas, to-wit:

"Being the North one-half of Block No. 13 as per plat of the town of Gladewater, which plat is recorded in Vol. A on page 3, Deed Records of Gregg County, Texas, said land being out of the H. R. Hokit Survey, being the same property described in a deed from D. S. Meredith, Sheriff of Gregg County, Texas, to A. F. Sheppard October 5, 1917."

The two deeds were filed for record September 24, 1921, and recorded in the Deed Records of Gregg county.

Pat Thompson testified, in substance, that he purchased the land from Mr. Sheppard in 1917 or 1918, during the World War; that he immediately went into possession, fenced it, built a dwelling house on it, and had since continuously occupied and used it as his home, paid the taxes on it, and claimed to own it "because he had bought the land from Mr. Sheppard." He further testified that he gave actual notice to his sister, Minnie Thompson Jones, and to his brother, Leroy Thompson, at or about the time he purchased it, that he was claiming title to the land because he had "bought it from Mr. Sheppard." That Mr. Sheppard executed the deed to the land after he paid for it.

In response to special issues, accompanied by appropriate instructions and definitions, the jury found the facts in favor of plaintiff Pat Thompson, on his claim of title under the statute of ten years' limitation; and further, that defendants Minnie Thompson Jones and Leroy Thompson received notice in 1918 that Pat Thompson was claiming the land adversely to them.

Defendants Minnie Thompson Jones and the heirs of Leroy Thompson filed a motion praying for judgment non obstante veredicto, based upon the alleged ground that the

findings of the jury in favor of plaintiff on his plea of limitation, and that his sister, Minnie Thompson Jones, and his brother, Leroy Thompson, had acquired notice in 1918 of his adverse claim against them, was without support in the testimony. The motion was sustained and judgment was entered awarding Minnie Thompson Jones title to an undivided one-third interest and to the heirs of Leroy Thompson an undivided one-third interest, and the remaining one-third undivided interest to plaintiff Pat Thompson. All other parties were disposed of in the judgment. Plaintiffs, Pat Thompson and his wife, have appealed.

Appellants have assigned as error the action of the trial court in rendering judgment for appellees for an undivided two-thirds interest in the property, notwithstanding the verdict of the jury, and in refusing to render judgment for appellants for all the property in accordance with the verdict of the jury.

Aside from that of constructive notice, the question here presented is whether or not the findings of the jury are without support in the testimony that Minnie Thompson Jones and Leroy Thompson had actual notice in 1918 of the adverse claim of their brother and cotenant, Pat Thompson, to the land. In support of such findings of the jury, the record reflects the following testimony:

Pat Thompson on direct examination testified:

"Q. Do you know the number of the block you live on? A. Yes sir.

"Q. What number of the block is it there you live on? A. The North half of block 13.

"Q. How long have you lived there? A. I moved there in 1917.

"Q. Are you sure of that date? A. Yes, sir, it was in 1917 or '18.

"Q. What makes you think it was one of those two years? A. Because the war was going on, the man that put the house up for me, Dr. Sheppard, I was farming for him, and he was keeping house, and he wanted me to hurry up and get done so I could take care of the farm across the river. We got the house done. I kept arguing to him, I says, 'We have got to go to war,' and he says, 'We are not arguing about the war now,' he says, 'We have got to hurry and get that house done.'

"Q. Did you ever get a deed to the North half of block 13? A. Yes, sir.

"Q. You say you built the house there some time while the World War was going on? A. Yes, sir.

"Q. Either in 1917 or 1918? A. Yes, sir.

"Q. Did you move in the house as soon as you got it completed? A. Yes, sir.

"Q. State where you have lived since that time? A. Right there on block 13, the north half. I have never been out of it.

"Q. Have you got a fence around the north half of block 13? A. Yes, sir.

"Q. When did you build the fence? A. When I built the house, I built the fence at the same time.

"Q. Does your wife live there with you all the time? A. Yes, sir.

"Q. Has any one, from the time you built that house in 1917 or '18, up until now, ever filed a suit against you for any interest in block 13? A. No, sir, not up until right now.

"Q. Did any of your brothers and sisters claim any interest in that place from the time you built the place up until recently? A. No, sir.

"Q. Was your brother Leroy anywhere around at the time you bought the land from Dr. Sheppard? A. Yes, sir, they both came to see me when I bought it, when I went to buy it back, when I got ready to buy it back, I went to Leroy and asked him for us to buy it back.

"Q. Was your sister, Minnie, anywhere around at the time you bought this land from Dr. Sheppard? A. She came down on a visit.

"Q. Came down on a visit? A. Yes, sir.

"Q. Did you talk to her about buying this place back? A. Yes, sir.

"Q. What conversation did you have with her? A. I told her, 'Let's buy it back,' and she told me she had a place in Oklahoma and wouldn't give me a nickel to help buy it back, because she had a home, and I says, 'I am going to buy it back,' and I told her I was going to get a party to buy it in for me and I would buy it from Dr. Sheppard. They didn't give me a nickel on the place in buying it back. I bought it back.

"Q. Did you have any conversation with your sister Minnie? A. Yes, sir.

"Q. Do you know when that was? A. After I got it paid off, she came back, after I bought it, I says, 'I have got me a home, too,' and she told me that was a good thing,

that my wife was getting old. I says, 'I am sure glad I have got a home.'

"Q. Did she lay any claim to the place? A. No, sir, not a bit.

"Q. Who paid for the building of the house on there? A. Dr. Sheppard, and I paid him.

"Q. Since you built that house in 1917 or 1918, state whether or not you have claimed that as your own? A. Yes, sir, I have been claiming it ever since as my own and paying taxes on it."

On cross-examination he testified:

"Q. I understood you to say a while ago —I want to get this right—you arranged with Dr. Sheppard to buy this at the sheriff's sale? A. I don't remember saying that.

"Q. What was it you said about that sale? A. I said this, I know I bought it from Dr. Sheppard.

"Q. What was it that you did about arranging for Dr. Sheppard to buy it? A. I didn't arrange about, I know Dr. Sheppard bought it and I bought it from him.

"Q. You built this house. Did Minnie ever live in that house? A. She spent a while there. She came on a visit.

"Q. Did Leroy ever visit in it? A. I don't believe Leroy has spent a night in that house.

"Q. Did you ever ask them to pay a part of the cost of the house? A. I asked them to help buy the stuff and the land and everything.

"Q. You asked them to help build the house? A. Yes, sir, to buy the land.

"Q. They wouldn't help to build the house? A. They wouldn't help buy the land.

"Q. I am talking about the house. Did you ask them to help build the house, you didn't ask them to help build your house? A. I don't know whether I asked them to help me buy the land back, help me buy the home back.

"Q. You didn't ask them to help you build the house? A. I don't know whether I did or not, I might.

"Q. You don't know about that? A. No, sir, I know I asked them to help me buy the land.

"Q. You do know you occupied the house all the time and lived in it with your family and you haven't paid any rent on it? A. No, sir.

"Q. You never have paid your brothers and sisters any rent at all on the land from the time you first used it? A. No, sir.

"Q. Never have paid a dime's rent? A. No, sir.

"Q. You put yourself on it and lived in it and didn't pay any rent? A. No, sir, not a nickel.

"Q. A while ago, Mr. Grant was asking you questions, you said that Minnie came to Gladewater, and you told Minnie that, if they wouldn't help you to buy that property in when it was sold for taxes, you were going to get somebody else to buy it in. A. I told them I would buy it back.

"Q. Had it been sold by the sheriff? A. I reckon it must have been, I told them I was buying it back and they told me they weren't going to pay a nickel on it.

"Q. How did you know Dr. Sheppard was selling it for taxes? A. I found it out after he had it.

"Q. All the interest you are claiming in this case is the interest Dr. Sheppard conveyed to you? A. I am claiming what I bought.

"Q. Just what he deeded to you? A. Yes, sir, the north half of block 13.

"Q. You never claimed it any way, except you claim you bought it, that is the only claim you have got to it, that you bought it? A. When I thought I bought it, it belonged to me.

"Q. You didn't claim it any other way? A. I claimed it every way that is right.

"Q. When did you first claim it any other way but by that deed? A. When I bought it.

"Q. You never did notify Leroy that you claimed this property as against him? A. Yes, sir.

"Q. Did you ever tell her before this suit was filed that you were claiming this place against her by limitation? A. I never did tell her that by limitation.

"Q. And never wrote her that, that you were claiming it by limitation until after the suit was filed? A. I told her this—

"Q. Just answer my question. You never did tell her you were going to claim this place by limitation, before the suit was filed, that is right? A. I told her this, I told her before there was anything about limitation, or before anything was talked about limitation. I told her I owned the place, I had bought it.

"Q. You didn't tell her that but that one time, either, did you? That was the only time you ever told her that? A. I told her this—I told her when I bought the place. I came to her and asked her, there was two pieces together, and I says, 'Let's buy the place together,' and she says, 'No, I wouldn't give you a nickel on that place.'

"Q. Where were you when you talked to her? A. In Gladewater. I told her then, I says, 'I am getting old and I have two places in Gladewater, and let's buy the places together,' and she says, 'No, I don't want it'—my brother was here before he married, and I says, 'Let's buy it back,' and he says, 'No.'

"Q. That place was sold for taxes? A. Yes, sir, then I bought it back.

"Q. You redeemed the place and took it back as your own? A. I bought it from Mr. Sheppard, that is all I know.

"Q. You redeemed it and had the deed made in your name? A. I bought it from Mr. Sheppard.

"Q. You bought the deed in your name when you did it? A. I reckon I had to make it in my name, I bought it.

"Q. That was after the tax sale. You don't know when it was you talked to Minnie about it. Did you ever talk to her any more after that, was that the only conversation you had? A. I think she told me after it was paid for, she told me she didn't want the place back, that I ought to have it.

"Q. When was that? A. That was when I was living on the place. She said she had a home and she wanted me to have it, that I was getting a home.

"Q. Do you know how long that was? A. It was a good long while ago. She said, 'I have a home in Oklahoma and you have a place here.' I says, 'Yes, I have a place here and we will try to stay here.'

"Q. I believe you said you were claiming this land because you bought it from Mr. Sheppard? A. Yes, sir.

"Q. You claim it under that deed, that is the way you claim the land? A. Yes, sir."

Minnie Thompson Jones testified:

"Q. Where do you live now? A. Hugo, Oklahoma.

"Q. How long have you lived in Hugo, Oklahoma? A. Ever since 1917—1916.

"Q. But you have been living at Hugo since 1917? A. Yes, sir.

"Q. From that time up until recently have you had occasional correspondence with Pat or his family? A. Yes, sir, all the while, ever since I have lived in Hugo.

"Q. Did they ever come to see you? A. They did.

"Q. How many times? A. My brother, he and his wife come once, and he come to see me two times—twice."

On cross-examination Minnie Thompson Jones testified:

"Q. Minnie, the last dollar you ever put in on the old place was in 1909? A. Yes, sir.

"Q. That was four dollars? A. Yes, sir.

"Q. That was to pay on the taxes for that year? A. I guess it was, he said to help him pay the taxes.

"Q. Was your father dead then? A. Yes, sir.

"Q. Was your mother dead then? A. Yes, sir.

"Q. Do you remember when he (Pat Thompson) built the house he is living in now? A. I think I do, I don't remember him building a house, but when I went to visit him the house was built.

"Q. What year was that? A. It was 1918 or 1919.

"Q. Along about the time of the World War? A. Yes, sir.

"Q. He had the house built then? A. Yes, sir, I was visiting with him.

"Q. Were you there in 1918? A. Yes, sir.

"Q. And he had built the new house then? A. He had.

"Q. Do you know whether your brother Pat can read or write or not? A. I know he cannot.

"Q. His wife can't either? A. No, sir.

"Q. Pat has been living in that house since 1918? A. Yes, sir, his home, what he claims.

"Q. And he has been claiming it since that time? A. Yes, sir.

"Q. You have known all these years, since 1918, Pat was claiming it? A. I did, I thought he was claiming it because he was staying there."

We think the testimony is amply sufficient to support the findings of the jury that Minnie Thompson Jones and Leroy Thompson received actual notice in 1918 of the adverse claim of Pat Thompson. The issue of such actual notice was one of fact. 11 Tex.Jur. 445, § 28. Being a material issue and supported by pleadings and evi-

dence, the trial court was without authority to render judgment non obstante veredicto, but should have rendered judgment in conformity with the verdict of the jury. R.S.1925, art. 2211, as amended by Acts 1931, 42d Leg. p. 119, ch. 77, § 1, Vernon's Annotated Revised Civil Statutes of Texas, art. 2211.

The judgment of the trial court in so far as it awards to Minnie Thompson Jones a one-third interest and to the heirs of Leroy Thompson a one-third interest in the property will be reversed, and judgment will here be rendered for appellants, Pat Thompson and wife, for the land sued for. In all other respects, the judgment of the trial court is affirmed.